UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE № 18-20946-CR-ALTONAGA

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

ISSAC LEAL,

    *Defendant.*

_____/

## ISSAC LEAL'S COMBINED OBJECTION TO PRESENTENCE INVESTIGATION REPORT AND SENTENCING MEMORANDUM

**ISSAC LEAL**, through undersigned counsel, respectfully submits this Sentencing Memorandum, pursuant to 18 U.S.C. § 3553(a), and the dictates of *United States v. Booker*, 543 U.S. 220 (2005) and its progeny. In support hereof, **ISSAC LEAL** (hereafter "**MR. LEAL**") submits the following:

### INTRODUCTION

The Presentence Investigation Report (hereafter "PSR") recommends a guideline range of 151 – 188 months. Based on the plea agreement, we believe that a two (2) point increase, and not a four (4) point increase, to **Mr. Leal's** base offense level is warranted based on the number of guns involved in the offense of conviction. Therefore, with a criminal history category of IV and a total offense level of 29, the sentencing guideline range should be 121 – 151 months. This sentencing memorandum serves to show why we believe that the jointly recommended sentence of 15 years is appropriate in this case.

# I.
# LEGAL OBJECTION

### MR. LEAL OBJECTS TO THE FOUR-POINT ENHANCEMENT
### RE: NUMBER OF FIREARMS INVOLVED IN THE OFFENSE

**MR. LEAL** objects to the PSR's recommendation of a four-point enhancement to his base offense level for the number of firearms involved in the offense. Pursuant to the "Offense Conduct" portion of the PSR, the relevant drug trafficking organization's (hereinafter "DTO") criminal conspiracy began in or around December 7, 2013 through October 30, 2018. However, **MR. LEAL** pled guilty to count six (6) of the superseding indictment, which explicitly states that he did not become involved with the DTO until October of 2017 and until October 30, 2018. In fact, from in or around 2013 through 2017 **MR. LEAL** was in and out of jail. The PSR does not tie any of **MR. LEAL'S** conduct to time periods before October of 2017. Thus, **MR. LEAL** should not be held responsible for firearms, which were associated with the DTO *before* he became involved. As reflected by the government in the plea agreement, the number of firearms that were involved in the offense of conviction, *i.e.*, from October 2017 through October 30, 2018, is between three (3) and seven (7) firearms, thus warranting a two (2) point enhancement – not a four (4) point enhancement as recommended in the PSR. *See United States v. Longstreet*, 603 F.3d 273, 278–79 (5th Cir. 2010) ("A defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant's joining the conspiracy, even if the defendant knows of that conduct. Absent particularized findings that [the defendant] was actually involved in [a coconspirator's] activities prior to 2001 or that [the defendant] was otherwise responsible for more than 200 firearms from 2001

through 2005, the present record provides no justifiable basis for the district court's assessment of the ten-level increase. . . . The district court's application of § 2K2.1(b)(1)(E) lacks support in the record and therefore constitutes clear error.").

## II.
## SECTION 3553 FACTORS

### A.
### HISTORY AND CHARACTERISTICS OF MR. LEAL

The 18 U.S.C. § 3553(a) requirement that the Court consider the "history and characteristics of the defendant" is a directive that the Court weigh the immediate misconduct in the context of the overall life of the defendant.

Upon meeting **MR. LEAL**, it was readily apparent to undersigned counsel that he is an extremely bright individual who, due to his environmental and economic circumstances, was never afforded a reasonable opportunity to succeed in life. Unfortunately, **MR. LEAL** lacked any positive role models to teach him values associated with being a hardworking, responsible, and productive member of society. **MR. LEAL** was born to unstable parents who failed to protect him from a series of unfortunate events.

**MR. LEAL** is twenty-nine (29) years old. He was born in Miami, Florida to Marina Quintero and an unknown male. Only his mother's name appears on his birth certificate. **MR. LEAL'S** biological father, the identity of whom is unknown to him, played absolutely no role in his life. **MR. LEAL'S** mother has suffered from severe drug addiction and mental health issues for his entire life. Due to her drug addiction, he and his siblings were taken away from their biological mother at a very young age. On October 25, 2001, Ms. Quintero's parental rights of **MR. LEAL** were legally terminated. It should be of no surprise

that **MR. LEAL'S** run-ins with the law commenced the same year his mother's parental rights were terminated. **MR. LEAL** was officially placed into the foster care system when he was ten (10) years old and remained there until he reached the age of maturity.

**MR. LEAL** did not fare any better in foster care. **MR. LEAL** recalls being relocated at least thirty (30) times from foster homes and shelters. Furthermore, **MR. LEAL'S** foster homes were far from being a safe place. In one of **MR. LEAL'S** foster homes he and his brother were sexually abused by their foster mother. His foster mother would show them sex cards and they would have to recreate the depictions on the cards. In another foster home, **MR. LEAL** was forced to wake up very early, before school, to run a mile. In this home his foster father was physically abusive to him. **MR. LEAL'S** traumatic time spent in foster care and traumatic childhood denied him an environment conducive to normal child development. See *Daniel v. Comm'r, Alabama Dept. of Corr.*, 822 F.3d 1248, 1276 (11th Cir. 2016) ("[r]ape has a permanent psychological, emotional, and sometimes physical impact on the child. We cannot dismiss the years of long anguish that must be endured by the victim of child rape."); *United States v. Walter*, 256 F.3d 891, 894 (9th Cir. 2001) ("The combination of brutal beatings by his father, the introduction to drugs and alcohol by his mother, and, most seriously, the sexual abuse he faced at the hands of his cousin, appear to us to be the type of extraordinary circumstances that may justify the consideration of the psychological effects of childhood abuse."); *Hitchcock v. Sec'y, Florida Dept. of Corr.*, 745 F.3d 476, 481 (11th Cir. 2014) ("While the circumstances of a defendant's crime are related to his culpability, his 'background and character [are also] relevant because of the belief, long held by society, that defendants who commit criminal

acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.'"); *see also Abdul-Kabir v. Quarterman*, 550 U.S. 233, 251–52 (2007).  **MR. LEAL** advised us that he never felt "at home" in any of his foster placements.  He always felt and was treated like an intruder.

Multiple placements in foster care as well as foster parent's practices, particularly harsh and negative punishment, are predictive of an increase in problem behavior for foster children.  Daniel Pollack, et al., *Multiple Foster Care Placements Should be Considered a Mitigating Factor in Criminal* Proceeding, 44 Ohio Northern University L. Rev. 85 (2018).  This is due to the wide held belief that attachment to a primary caregiver is an inherent need and a prerequisite for healthy psychological development.  *Id.* "Difficulties with attachment have been associated with lack of impulse control or empathy and criminality." *Id.* "Foster children also experience various developmental challenges. The effects of abuse and neglect on the developing brain have been well documented." *Id.* "Children in foster care have a higher likelihood of substance abuse, a factor that increases of delinquency." *Id.*

> Another challenge for foster children is making the transition to adulthood once they age out of foster care.  Children aging out of foster care experience many difficulties.  Apart from the fact that they may still be recovering from their traumatic experiences in their family of origin and within the foster care system, they have few social resources and limited access to education, employment, housing and other opportunities.

*Id.* It is unsurprising that aging out of foster care is associated with being arrested for a felony. *Id.*

> Being a foster child means by definition you are a person adrift in life. You do not have the benefits of a family unit to anchor to in times of trouble.

*Id.* The following hypothetical reflects the countless number of foster youths who fit this description, many of whom join gangs and end up dead or serving serious time behind bars. *Id.* at n. 122.

> He wants to fit in and will do whatever he is told. He has been shuffled from placement to placement, finding no permanent place to call home, no secure place to rest his head at night, no one person to call mom or dad, and no one to meet his emergent needs as a result of abuse, maltreatment and removal from his family of origin. Joiner ages out of foster care only to pick up his first charge for being in the wrong place at the wrong time.

Unfortunately, like "Joiner", **MR. LEAL** joined a bad group of individuals – he describes them as the only people who ever made him feel like he belonged - the only family he ever knew. As he stated in his acceptance of responsibility statement, **MR. LEAL** did many wrong and criminal things for his "family." **MR. LEAL** realizes that he was wrong – he was just being used – and has vowed to make himself better. **MR. LEAL** has also developed a severe drug addiction. **MS. LEAL** has always used drugs as a numbing tool to free him from the anxieties of his traumatizing childhood. He has self-medicated with drugs since the age of eleven (11).

### B.
### MR. LEAL'S HISTORY OF SUBSTANCE ABUSE AND REQUEST FOR RDAP

**MR. LEAL** has an extensive and significant history of substance abuse. **MR. LEAL** began abusing drugs when he was just eleven (11) years old and has continued to abuse drugs. **MR. LEAL** has been unsuccessful in his attempts to become sober. Due to **MR.**

**LEAL'S** severe addiction, he would benefit *greatly* from the RDAP program offered by the Bureau of Prisons.

### III.
### CONCLUSION

Although **MR. LEAL'S** guideline range presently stands at 151 to 188 months based upon an offense level of 31, it should be reduced to level 29, and the sentencing guideline range should be 121 – 151 months. In either event, the parties agreed to jointly recommend a sentence of 15 years (180 months) and we urge the court to accept our joint recommendation.

WHEREFORE, this Court should consider **MR. LEAL'S** unique characteristics under 18 U.S.C. § 3553(a)(1) when determining the appropriate sentence in this case.

Respectfully submitted,

**RABIN & LOPEZ, P.A.**
800 Brickell Avenue, Suite 1400
Miami, FL  33131
Tel: 305•358•1064
Email: sjr@miamilawyer.com

*s/ Samuel J. Rabin, Jr.*

Samuel J. Rabin, Jr.
Florida Bar № 273831

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of June 2020, a true and correct copy of the foregoing Sentencing Memorandum was furnished via the CM/ECF system to all parties designated to receive the electronic filings in this cause.

*s/ Samuel J. Rabin, Jr.*

SAMUEL J. RABIN, JR.